I

 Positive
As of: August 5, 2019 6:05 PM Z

# Williams v. Weber County

United States District Court for the District of Utah, Northern Division

June 17, 2013, Decided; June 17, 2013, Filed

Lead Case No.: 1:11-CV-21 CW; Member Cases: 1:11-CV-30; 1:11-CV-33; 1:11-CV-34; 1:11-CV-37

**Reporter**
2013 U.S. Dist. LEXIS 85574 *; 2013 WL 3070618

FRANK DONALD WILLIAMS, Plaintiff, v. WEBER COUNTY et al., Defendants.

**Subsequent History:** Affirmed by Williams v. Weber County, 2014 U.S. App. LEXIS 6957 (10th Cir., Apr. 15, 2014)

## Core Terms

indigent, convictions, ineffective, cases, attorneys, sentence, invalid, defense counsel, non-movant, rights, county commissioner, damages, corpus, summary judgment, requirements, deficient

**Counsel:** [*1] For Frank Donald Williams (1:11-cv-00021-CW), Plaintiff: Michael P. Studebaker, OGDEN, UT.

For Daniel Larry, Daniel Lobato, Joseph Stone, Stephanie Slater (1:11-cv-00021-CW), Consol Plaintiffs: Michael P. Studebaker, OGDEN, UT.

For Weber County, Craig L. Dearden, in his official capacity, Jan M. Zogmaister, in her official capacity, Kerry W. Gibson, in his official capacity (1:11-cv-00021-CW), Defendants: Frank D. Mylar, LEAD ATTORNEY, MYLAR LAW PC, SALT LAKE CITY, UT.

For Ken Bischoff, in his official capacity (1:11-cv-00021-CW), Consol Defendant: Frank D. Mylar, LEAD ATTORNEY, MYLAR LAW PC, SALT LAKE CITY, UT.

For Daniel Lobato (1:11-cv-00030-CW), Plaintiff: Michael P. Studebaker, OGDEN, UT.

For Weber County, Utah, Craig L. Dearden, in his official capacity, Jan M. Zogmaister, in her official capacity, Ken Bischoff, in his official capacity (1:11-cv-00030-CW), Defendants: Frank D. Mylar, LEAD ATTORNEY, MYLAR LAW, P.C., COTTONWOOD HEIGHTS, UT.

For Joseph Stone (1:11-cv-00033-CW), Plaintiff: Michael P. Studebaker, LEAD ATTORNEY, OGDEN, UT.

For Weber County Utah, Craig L. Dearden, in his official capacity, Jan M. Zogmaister, in her official capacity, Ken

Bischoff, in his official capacity [*2] (1:11-cv-00033-CW), Defendants: Frank D. Mylar, LEAD ATTORNEY, MYLAR LAW, P.C., COTTONWOOD HEIGHTS, UT.

For Daniel Larry (1:11-cv-00034-CW), Michael P. Studebaker, OGDEN, UT.

For Weber County Utah, Craig L. Dearden, in his official capacity, Jan M. Zogmaister, in her official capacity, Ken Bischoff, in his official capacity (1:11-cv-00034-CW), Frank D. Mylar, LEAD ATTORNEY, MYLAR LAW, P.C., COTTONWOOD HEIGHTS, UT.

For Stephanie Slater (1:11-cv-00037-CW), Michael P. Studebaker, LEAD ATTORNEY, OGDEN, UT.

For Weber County Utah, Craig L. Dearden, in his official capacity, Jan M. Zogmaister, in her official capacity, Kerry W. Gibson, in his official capacity, Defendants: Frank D. Mylar, LEAD ATTORNEY, MYLAR LAW, P.C., COTTONWOOD HEIGHTS, UT.

**Judges:** CLARK WADDOUPS, United States District Judge.

**Opinion by:** CLARK WADDOUPS

## Opinion

### MEMORANDUM DECISION AND ORDER

### INTRODUCTION

Plaintiffs in these consolidated cases are individuals who have each been charged with one or more crimes, qualified as indigent, requested appointment of indigent defense counsel, pled guilty, and were convicted in Weber County. Plaintiffs sued Weber County and each of the county commissioners in their official capacities under 42 U.S.C. § 1983, claiming [*3] violation of their Sixth Amendment right to counsel. Plaintiffs' claims are based on allegations of inadequate funding for indigent defense in Weber County and failure to

2013 U.S. Dist. LEXIS 85574, *3

train, supervise, and monitor the criminal defense attorneys who were appointed in their cases. However, Plaintiffs have not attempted to invalidate their convictions in any prior proceeding, nor have they filed malpractice suits against the attorneys who allegedly provided them constitutionally deficient legal representation. Because Plaintiffs are all represented by the same counsel and their complaints are nearly identical, the cases were consolidated in the interest of judicial economy. For simplicity, the Court will refer to the Complaint of the lead Plaintiff, Frank Donald Williams (Docket No. 3), while noting any relevant differences between the member cases as necessary.

Before the Court is Defendants' Motion for Summary Judgment (Doc. No. 21) on all claims. Defendants assert that the claims of ineffective assistance of counsel in Count I of the Complaint are barred under *Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed.2d 383 (1994). Regarding Count II, Defendants argue that Plaintiffs' claims under [*4] the Utah Constitution are not cognizable because they are identical to those in Count I and Plaintiffs have adequate alternative remedies at law.

## ANALYSIS

### I. Summary Judgement Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party moving for summary judgment bears the initial burden of showing "that there is an absence of evidence to support the non-moving party's case." *Celotex, 477 U.S. at 325*. This burden may be met merely by identifying portions of the record which show an absence of evidence to support an essential element of the opposing party's case. *Johnson v. City of Bountiful, 996 F. Supp 1100, 1102 (D. Utah 1998)*. Once the moving party satisfies its initial burden, "the burden then shifts to the nonmoving party to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of [the disputed] [*5] element." *Id.* A fact in dispute is "material" only if it might affect the outcome of the suit under governing law. *Allen v. Muskogee, 119 F.3d 837, 839 (10th Cir. 1997)*. The dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

A non-movant who "would bear the burden of persuasion at trial" must "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, 144 F.3d 664, 671 (10th Cir. 1998)*. Mere allegations and references to the pleadings will not suffice, instead, the specific facts put forth by the non-movant "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Thomas v. Wichita Coca-Cola Bottling, 968 F.2d 1022, 1024 (10th Cir. 1992)*. Moreover, "the nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir. 1991)*. [*6] The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999)*.

### II. Material Facts

1. Utah law provides that "each county, city, and town shall provide for the legal defense of an indigent in criminal cases in the courts and various administrative bodies of the state in accordance with legal defense standards . . . ." *Utah Code Ann. § 77-32-301*. (Comp. ¶ 3.)

2. In 2010, Weber County changed its Public Defender Program from contracting with a private non-profit corporation to entering into individual contracts with qualified defense attorneys. Weber County also employs one attorney to coordinate the work and ensure quality work product among the various attorneys. Work loads are monitored by the Coordinator and he is responsible to notify Weber County if workloads require additional attorneys. Weber County further relies upon the professionalism and legal ethics standards of the Utah State Bar and Weber County to regulate the performance of indigent defense counsel. (Affidavit of Chief Deputy Attorney David C. Wilson ("Wilson Aff.") ¶ 3.)

3. Plaintiffs allege [*7] that the new system and procedures for funding indigent defense impedes the provision of adequate legal representation. (Comp. ¶¶ 30-31, 34.)

4. Plaintiffs allege that Weber County and its commissioners provide inadequate funding for indigent defense services, as partly demonstrated by comparing the budget for indigent defense with the entire budget of the Weber County Attorney's Office. (Comp. ¶¶ 7-15.)

5. Plaintiffs allege that the county commissioner Defendants exercise no supervision, and have not established or enforced any of the practice standards advanced by various national organizations, many of which have been adopted by state and local entities across the country. (Comp. ¶¶ 35-40.)

6. Plaintiffs allege that the county commissioners have not enforced national standards of professional responsibility with regard to indigent defense counsel conduct. (Comp. ¶¶ 41-45.)

7. Plaintiffs allege that the county commissioners have not trained indigent defense counsel. (Comp. ¶¶ 46-51.)

8. Plaintiffs allege that the county commissioners have failed to monitor the workloads of the indigent defense counsel. (Comp. ¶¶ 52 - 59.)

9. Plaintiffs allege that underfunding has resulted in a failure [*8] to adequately compensate indigent defense counsel. (Comp. ¶¶ 60-64.)

10. Plaintiffs allege that underfunding has resulted in a failure to provide support services. (Comp. ¶¶ 65-68.)

11. Plaintiffs allege that their attorneys failed to provide competent representation by not performing the duties commonly expected of indigent defense counsel, however, none of the Plaintiffs have sued their attorneys for malpractice. Plaintiffs blame the county commissioners for this alleged failure, asserting that underfunding and lack of supervision, training and monitoring caused these deficiencies and contributed to their convictions. (Comp. ¶¶ 35-74.)

12. Plaintiffs do not allege that their convictions were reversed, expunged, declared invalid, or called into question by issuance of a writ of habeas corpus. (Comp. ¶¶ 1-78.)

13. Plaintiff's have not identified any instance where a Weber County contract attorney was found to have provided constitutionally deficient legal assistance in representing an indigent defendant. (Comp. ¶¶ 1-78.)

### III. Count I: Section 1983 Claim

Plaintiffs allege in Count I of their Complaints that Defendants failed to provide them adequate legal representation in violation of their [*9] rights under the Sixth and Fourteenth Amendments. Plaintiffs seek damages for this alleged constitutional violation under 42 U.S.C. § 1983. Defendants' summary judgment motion asserts that Plaintiff's § 1983 claims are not cognizable because success on those claims would necessarily undermine the validity of Plaintiffs' criminal convictions and sentences as prohibited under *Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed.2d

383 (1994).

In *Heck*, the Supreme Court held that a § 1983 claim is not cognizable if it would render invalid a plaintiff's conviction or sentence. *Heck*, 512 U.S. at 486-87. This rule is known as the "*Heck* bar." *See Wallace v. Kato*, 549 U.S. 384, 127 S. Ct. 1091, 1098, 166 L. Ed. 2d 973 (2007). The *Heck* bar requires a district court to determine-as a jurisdictional matter-whether a plaintiff's § 1983 claim, if successful, would necessarily imply the invalidity of the plaintiff's conviction or sentence. *Heck*, 512 U.S. at 487. If so, before proceeding under § 1983 the plaintiff must first overcome the *Heck* bar by showing that the conviction or sentence has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such [*10] determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." *Id.*

The Tenth Circuit has held that in cases subject to the *Heck* bar, failure to plead the essential element of a favorable result in the criminal case, either by appeal or in a habeas corpus proceeding, amounts to failure to state a claim under § 1983. *See Davis v. Kan. Dep't of Corr.*, 507 F.3d 1246, 1248, 1249 (10th Cir. 2007). The Tenth Circuit has also held that the *Heck* bar precludes claims involving pending charges when a judgment in favor of the plaintiff would necessarily imply the invalidity of any conviction or sentence that might result from the ongoing prosecution. *Beck v. City of Muskogee Police Dep't*, 195 F.3d 553, 557 (10th Cir. 1999).

Plaintiffs' ineffective assistance of counsel claim necessarily implies the invalidity of their convictions and sentences. To establish ineffective assistance of counsel a petitioner must prove in a habeas corpus proceeding that their counsel's performance fell below a reasonable standard, and that the petitioner's rights were actually prejudiced by the substandard performance. *See Strickland v. Washington*, 466 U.S. 668, 687 n. 6., 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). [*11] In *Strickland*, the Supreme Court held that in order to show prejudice a "[criminal] defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Because the threshold requirement for showing ineffective assistance of counsel-sufficient probability of unprofessional conduct to undermine confidence in the outcome of the criminal proceeding-is inextricably intertwined with the validity of the criminal conviction and sentence, Plaintiffs cannot possibly prevail on their present claim without directly undermining the validity of their convictions.

Plaintiffs have not offered any persuasive support for their

contention that *Heck* does not bar their present claims. Plaintiffs' bald assertion that their claims are not barred simply because they are "constitutional claims" does not pass muster. Although Plaintiffs cite cases where *Heck* was found not to bar certain constitutional claims, such as claims of excessive police force, unconstitutional prison conditions, or denial of due process in [*12] prison disciplinary proceedings, those types of claims do not directly implicate the validity of an underlying criminal conviction as a claim of ineffective assistance of counsel does. Importantly, Plaintiffs have not cited a single case where a claim of ineffective assistance of counsel, or a remotely similar claim, was found to be exempt from the *Heck* bar. Nor have Plaintiffs offered any reasonable theory to support such a reading of *Heck*. Plaintiffs' attempt to recast their claim as merely a "challenge to procedures" in unpersuasive. (Doc. No. 29 at 21.) Although Plaintiffs contend that they "are not attacking their convictions," they admit to "attacking the deficient indigent defense program in Weber County." (Id. at 22.) The adequacy of Weber County's indigent defense program, however, is directly tied to the validity of Plaintiffs' convictions. Thus, Plaintiffs cannot show that they were denied constitutionally sufficient legal representation by Defendants without directly undermining their convictions or sentences.

Because Plaintiffs' ineffective assistance of counsel claims are subject to the *Heck* bar, in order to state a claim under § 1983 Plaintiffs must plead facts showing [*13] that their convictions have previously been invalidated on direct appeal, expunged, or called into question by issuance of a writ of habeas corpus. Plaintiff's have not made such a showing. Thus, the Court concludes that Count I of Plaintiffs' Complaint fails to state a claim on which relief can be granted. [1]

## IV. Count II: Utah Constitutional Claims

Count II of Plaintiffs' Complaint asserts claims of ineffective assistance of counsel under Article I, Sections 7 and 12 of the Utah Constitution based on the same facts as Count I. Article I, Section 7 provides, "No person shall be deprived of life, liberty or property, without due process of law." Utah Const. art. I, § 7. Article I, Section 12, states in relevant part, "[I]n criminal prosecutions the accused shall have the right to appear and defend in person and by counsel . . . . In no instance shall any accused person, before final judgment, be compelled to advance money or fees to ensure the rights

herein guaranteed." Utah Const. art. I, § 12. Thus, although [*14] premised on state law, Count II of the Complaint is essentially identical to Plaintiffs' § 1983 claim.

In *Spackman v. Bd. of Ed. of Box Elder County*, 2000 UT 87, 16 P.3d 533 (Utah 2000), the Utah Supreme Court held that "aside from the Takings Clause, there is no textual constitutional right to damages for one who suffers a constitutional tort." *Id.* ¶ 20, 16 P.3d at 537. The court further "disavow[ed] any statements in *Bott v. Deland*, 922 P.2d 732 (Utah 1996), that might suggest otherwise." *Id.* at n. 5, 16 P.3d at 538. Thus, to avoid easily creating judicial remedies for constitutional violations, *Spackman* held "that a plaintiff must establish the following three elements before he or she may proceed with a private suit for damages." *Id.* ¶ 22, 16 P.3d at 538. "First, a plaintiff must establish that he or she suffered a 'flagrant' violation of his or her constitutional rights." *Id.* ¶ 23, 16 P.3d at 538. "Second, a plaintiff must establish that existing remedies do not redress his or her injuries." *Id.* ¶ 24, 16 P.3d at 538. "Third, a plaintiff must establish that equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her [*15] injuries." *Id.* ¶ 25, 16 P.3d at 539.

Plaintiffs cannot satisfy each of these elements. First, although Plaintiffs assert that Defendants flagrantly violated Plaintiffs' rights "by being more concerned about money than a constitutionally appropriate indigent defense program" (Doc. No. 29 at 23), they do not offer any admissible evidence to support this assertion. Regarding the second element, Plaintiffs merely state that "there is no remedy [because] the Defendants still continue to have a deficient program." (Doc. No. 29 at 23.) This assertion, however, overlooks the fact that damages are available under § 1983 for violations of the Sixth Amendment right to counsel, subject to the jurisdictional requirements of *Heck*. The fact that Plaintiffs must first overcome the *Heck* bar before filing a § 1983 suit does not mean that no remedy exists to redress Plaintiffs' injuries. Moreover, Plaintiffs also have an adequate remedy at law through a state malpractice claim against their allegedly ineffective counsel. Finally, even assuming that Plaintiffs could satisfy the first two requirements, the third *Spackman* element requires Plaintiffs to show that equitable relief, such as an injunction, was [*16] and is wholly inadequate to protect their rights or redress their injuries. However, Plaintiffs have not shown that they lack equitable remedies such as direct appeal of their convictions or pursuit of habeas corpus relief.

Because Plaintiffs cannot satisfy each of the *Spackman* requirements, the Court follows the lead of other jurisdictions that have refused to create a damages remedy where Congress has already provided an adequate alternative remedy. *Id.* ¶ 24,

---

[1] Because the court does not have jurisdiction under *Heck*, the Court will not address Defendants' alternative argument that it also presents a non-justiciable political question.

16 P.3d at 538 (citing United States Supreme Court cases and cases from other jurisdictions to show that merely suffering a constitutional violation is not enough to create a damages remedy when a remedy exists under another area of law). Accordingly, Plaintiffs' state constitutional claims in Count II of the Complaint are dismissed.

## ORDER

Based on the foregoing analysis, **IT IS HEREBY ORDERED** that:

(1) Defendants' Motion for Summary Judgment (Doc. No. 21) is **GRANTED**; and,

(2) this case is **CLOSED**.

DATED this 17th day of June, 2013.

BY THE COURT:

/s/ Clark Waddoups

CLARK WADDOUPS

United States District Judge

End of Document

J



Neutral
As of: August 5, 2019 6:06 PM Z

# Orco Invs. v. City of Romulus

Court of Appeals of Michigan

June 26, 2012, Decided

No. 303744

**Reporter**

2012 Mich. App. LEXIS 1254 *; 2012 WL 2402599

ORCO INVESTMENTS, INC., Plaintiff-Appellant, v CITY OF ROMULUS, ROMULUS PLANNING COMMISSION, and ROMULUS CITY COUNCIL, Defendants-Appellees.

**Notice:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Subsequent History:** Leave to appeal denied by Orco Invs., Inc. v. City of Romulus, 2013 Mich. LEXIS 90 (Mich., Jan. 25, 2013)

**Prior History:** [*1] Wayne Circuit Court. LC No. 09-018235-CK.

## Core Terms

storm water, summary disposition, trial court, site plan, regulation, plans, regulatory taking, drainage, statute of limitations, negotiations, defendants', reinstate, easement, city's, drainage system, long term, motion to reinstate, equal protection, permits, soil erosion, relinquished, substantive due process claim, city council, issues, zoning, substantive due process, light most favorable, planning commission, government action, purchase property

**Judges:** Before: K. F. KELLY, P.J., and SAWYER and RONAYNE KRAUSE, JJ. RONAYNE KRAUSE, J. (concurring in part and dissenting in part).

## Opinion

PER CURIAM.

Plaintiff, Orco investments, Inc., appeals as of right from an order granting summary disposition in favor of defendants, the City of Romulus, the Romulus Planning Commission, and the Romulus City Council,[1] in this regulatory taking claim. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

### A. THE OVERLAY DISTRICT

This case arises from Orco's intent to develop 18 single-family condominiums on a vacant, 7.35-acre piece of property located on Superior Road in Romulus. In September of 2003, Orco submitted a preliminary site plan for its project to the planning commission. The property was zoned RI-B, for single family residences, so Orco's plans were proper under the applicable zoning ordinances. Orco did not yet own the property, but intended to buy it.

At a city council meeting on December 8, 2003, many individuals living near the property, including the mayor of Romulus, voiced [*2] their concern and dissatisfaction with Orco's development plan. These residents were worried that development would affect the rural character of the neighborhood. The city council then passed a six-month moratorium on issuing building permits for the area, which included the property that Orco planned to develop.

At a planning commission meeting on December 15, 2003, the commission tabled approval of Orco's site plans and asked Orco to work with the city and make changes to address some of the concerns raised by citizens at the city council meeting. Orco met with the city's engineers and adapted its plans. The plan was brought up again at the planning commission's February 2004 meeting, when four members voted to approve Orco's preliminary site plan and four members voted to deny it (the ninth member of the commission was not present). This was interpreted as a denial of the plan.

On March 26, 2004, Orco filed an action in Wayne Circuit Court and asked the court to order the city to approve Orco's

---

[1] In a prior order, summary disposition was granted as to the Planning Commission and the City Council, but they continue to be named parties.

preliminary site plan.[2] The trial court ordered the city to include the issue on the Board of Zoning Appeals' (BZA) agenda. On July 7, 2004, the BZA reversed the decision of the planning commission [*3] and approved Orco's preliminary site plan. Orco finalized its purchase of the property on July 16, 2004. However, on June 15, 2004, before this approval and purchase, the city adopted the "Rural Characters Overlay District," which included the property that Orco sought to develop. The Overlay District increased the lot size requirement for the property, reduced the number of condominium units that Orco could develop, and required Orco to completely revise its development plans. Orco requested that the court relieve it from the requirements of the Overlay District. The court ordered Orco to appeal to the BZA for a use variance, but the BZA denied Orco's request.

Orco then moved for summary disposition under MCR 2.116(C)(10) and argued that the Overlay District should not apply to its site plan because the city acted in bad faith and with unreasonable delay when it initially denied Orco's preliminary site plan in February of 2004. At a motion hearing held on November 19, 2004, the circuit court agreed and granted Orco a writ of mandamus. The court concluded that Orco's [*4] preliminary site plan should have been approved originally, so the subsequently adopted Overlay District did not apply. The court then explained that the City attempted "to block this preliminary site plan with every possible obstacle," and that the "adoption of the Overlay District on June 15, 2004 was for the sole purpose of stopping Plaintiff's development and manufacturing a defense to this suit." Orco proceeded with development of the property, but alleged that the city continued to purposefully delay approval of various permits required and Orco's final site plan by creating problems with: 1) the storm water drainage system; 2) the Soil Erosion and Sedimentation Control (SESC) permit; and, 3) the long-term maintenance agreement for the storm water drainage system.

## B. STORM WATER DRAINAGE SYSTEM

In October of 2003, the city's engineer expressed his concern to Orco that the storm water drainage ditch parallel to Superior Road could not accommodate the additional storm water drainage from Orco's proposed condominium development. The city engineer suggested that Orco use adjacent property belonging to the Romulus School District because it could better accommodate the development's [*5] storm water drainage. The school district's superintendent, Joel Carr, and the school district's facilities director, Donald Morris, initially agreed to grant Orco an

easement for storm water drainage and the parties began negotiations. Randall C. Orley, the president of Orco, claims that in early 2005 he had a telephone conversation with Carr and Eric Garber, another Orco employee. During this conversation, Carr indicated that the mayor of Romulus and other city officials were pressuring Carr to deny the storm water drainage easement to Orco because areas of the city were "best kept separate by their existing racial makeup." These officials were concerned about African Americans moving into the planned condominium development. However, Carr testified that city officials never told him to deny Orco's easement. According to Carr, negotiations over the easement halted because of Orco's failure to respond.

Orley claimed that Orco's time negotiating with the school district and developing engineering plans to use the district's property for storm water drainage were thus rendered useless. Orco returned to its original plan to use the Superior Street ditch, which it had abandoned at the [*6] city's suggestion and request.

## C. SESC PERMIT

Before beginning construction, a SESC permit was required. On May 23, 2005, the city voted to relinquish jurisdiction of SESC permits to the Wayne County Soil Erosion Department (WCSED). The city did so after the Michigan Department of Environmental Quality (MDEQ) told the city that it needed more staff and additional training to maintain its SESC program. The soil erosion program did not take in enough revenue to justify paying for these changes, so the city turned jurisdiction of the program over to the WCSED. The WCSED's jurisdiction over the city's SESC permits began on June 1, 2005. When the city relinquished jurisdiction of soil erosion permits, it also lost control of approving engineering plans for storm water drainage and management. Orley claims that the city did not inform Orco that it no longer had authority to award SESC permits or approve engineering plans for storm water drainage systems.

On November 16, 2005, while attending a meeting at the WCSED, Orco's engineer was informed that the city no longer had control over SESC permits and Orco thus had to apply for approval of its plan with the WCSED. Orco also had to apply to the [*7] Wayne County Department of Public Service (WCDPS) to find out if the WCDPS would have jurisdiction over all of the storm drainage issues related to Orco's development. This required the preparation of new engineering plans to be submitted to the city, the city's engineers, the WCSED, and the WCDPS. On May 11, 2006, Orco's plans were approved, as long as the city accepted jurisdiction and responsibility for long term maintenance of the storm water drainage system.

---

[2] See *Orco Investments, Inc v City of Romulus and City of Romulus Planning Comm*, Wayne Circuit Court Case No. 04-409170-CH.

## D. LONG TERM MAINTENANCE AGREEMENT FOR STORM WATER DRAINAGE SYSTEM

Orco then sent the city a proposed agreement, under which the city would assume jurisdiction and responsibility for the long term maintenance of the development's storm water drainage system, as required by the WCSED. The city responded on May 2, 2006, and said that Orco's proposed agreement lacked certain essential information, like a description of the project and who prepared the project's plans. The city also requested separate documents providing for an access easement. In addition, it appears that the city told Orco it would not sign a maintenance agreement unless Orco agreed to dismiss the 2004 case.[3] Over the next several months, Orco and the city negotiated [*8] the terms of the agreement. In March of 2007, the parties executed a final agreement.

## E. PROCEDURAL HISTORY

On August 30, 2006, Orco held a public auction for the property. The minimum bid price was $375,000. No one attended or bid at the auction. Orley claimed that if the city had approved its preliminary site plan in 2003, the property would have been developed and ready for sale in March of 2005. If the plan had been approved in 2003, Orco's soil erosion and storm water drainage plans would have been approved by the city before it relinquished jurisdiction. As a result, Orco would not have needed to develop new engineering plans to submit to the WCSED and the WCDPS, which pushed back development even further. Orley contended that "[w]hat should have been a nine month to one year project became a five and one-half year fiasco. . . ."

On July 24, 2009, Orco filed a complaint in a new suit against defendants. In Count I, Orco alleged that the planning commission's denial of its site plan violated Orco's equal protection and [*9] substantive due process rights under the Michigan Constitution. Orco claimed that defendants "purposefully and willfully rezoned Orco's Property by an 'Overlay District' in furtherance of its bad faith efforts to prevent development." In Count II, Orco contended that defendants' actions, including the denial of Orco's site plan and its attempt to rezone the property, resulted in an unlawful regulatory taking without just compensation under Michigan Constitution, 1963 Art 10, § 2.

On March 1, 2010, defendants filed their first motion for summary disposition. Defendants alleged that all of Orco's claims are barred by a three-year statute of limitations. Defendants also argued that the claims against the planning commission and city council should be dismissed because those entities did not have a separate legal existence; they were part of the city itself.

On March 26, 2010, the trial court held a hearing on defendants' first motion for summary disposition and made an oral ruling granting the motion in part and denying it in part. The court concluded that Orco's equal protection and due process claims were time-barred if they rested on events that occurred before July 24, 2006. Based [*10] on the record, it appeared that the only remaining event was the city's alleged refusal to sign an agreement accepting jurisdiction over the long term maintenance of the storm water drain, which occurred sometime between July 19, 2006, and August 23, 2006. The court specifically rejected Orco's argument that these claims accrued on August 30, 2006, when no one bid on the property at auction. The trial court denied defendants' motion on Orco's regulatory taking claim because the statute of limitations is six years. The court stated that the planning commission and city council were not separate legal entities which could be held liable in tort, so they were entitled to summary disposition under MCR 2.116(C)(8). An order reflecting this oral decision was issued on June 7, 2010.

On February 11, 2011, defendants filed a second motion for summary disposition. First, defendants argued that the city's "temporary refusal to assume long term maintenance responsibilities of Plaintiff's storm water system" was the only alleged wrong giving rise to a timely substantive due process claim. This alleged wrong did not shock the conscience, and it did not deprive Orco of any property interest. Orco [*11] was not entitled to an agreement where the city assumed long term maintenance responsibility for the storm drainage system of its private development. Furthermore, the city did not refuse to enter into such an agreement. Although negotiating the agreement took time, the city ultimately agreed to assume responsibility of long term maintenance of the development's storm water drainage system.

Defendants also argued that Orco failed to establish a regulatory taking claim because the property did not lose all economic value. An appraiser hired by Orco valued the property at $70,000 and, although this was less than what Orco paid for the property, the decrease in value is comparable to the general decrease in property values associated with the recession. During the six months when the Overlay District was in effect, Orco could not have proceeded with development because of other issues, like storm water drainage. Orco also could not establish a takings claim based on the city's relinquishment of jurisdiction over SESC permits; this action affected SESC permit applicants

---

[3] At this point the previous litigation had been dismissed for lack of progress pursuant to MCR 2.502, although it seems that the parties were not aware of this fact.

uniformly and was the result of pressure from the MDEQ. Furthermore, Orco did not have reasonable investment-backed expectations [*12] because it knew about the Overlay District when it purchased the property.

At a hearing held on March 4, 2011, the trial court granted defendants' motion for summary disposition on the remaining claims and denied Orco's counter-motion for partial summary disposition. The court first addressed Orco's regulatory taking claim. The court concluded that defendants acted in bad faith by adopting a zoning ordinance that singled out Orco's property. However, the court reasoned that the economic effect of the ordinance on Orco's property was minimal. Even if the Overlay District was not in effect in 2004, Orco could not have continued development because it took Orco longer than that to address the development's storm water drainage issues. In addition, Orco had not yet purchased the property when the Overlay District was adopted, so any effect of the rezoning should have been accounted for in the purchase price. The court found significant the fact that Orco knew of the Overlay District when it purchased the property.

In addition, the trial court held that the other alleged actions by defendants did not constitute takings under the Fifth Amendment. Orco presented no evidence, other than inadmissible [*13] hearsay evidence, that the city council interfered with its negotiations with the school district for a storm drainage easement. Rather, Carr testified that council members and the mayor did not contact him regarding the easement. Regarding issuing SESC permits, the court concluded that the city did not act in bad faith; it rescinded jurisdiction because the MDEQ required additional staff and training, and compliance was not economically-efficient for the city. The court also concluded that the city's relinquishment of jurisdiction had no economic effect on the property and did not interfere with distinct investment-backed expectations. Orco knew it needed a SESC permit. It had not yet applied for one with the city. There did not seem to be any delay in approval of Orco's application, and if there was, this delay was not the fault of the city. The delay in approving the long term maintenance agreement was due in large part to Orco's failure to include certain information or make discussed changes to the proposed agreement. Thus, any economic impact that resulted from the alleged delay is attributable to Orco. Finally, the court dismissed Orco's substantive due process and equal protection [*14] claims because those that were not barred by the statute of limitations were meritless for reasons already discussed.

Orco now appeals as of right.

## II. ANALYSIS

## A. STANDARDS OF REVIEW

"This Court reviews de novo a trial court's decision on a motion for summary disposition." *Cedroni Assoc v Tomblinson, Harburn Assoc,* 290 Mich App 577, 584; 802 NW2d 682 (2010). A motion for summary disposition brought pursuant to MCR 2.116(C)(10) applies to the factual support for a party's cause of action. *Id.* When reviewing a motion for summary disposition brought under MCR 2.116(C)(10), this Court considers the pleadings, affidavits, and other evidence in the light most favorable to the nonmovant. *Id.* A motion for summary disposition should be granted "if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Latham v Barton Malow Co,* 480 Mich 105, 111; 746 NW2d 868 (2008). A genuine issue of material fact exists when "reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Allison v AEW Capital Mgt, LLP,* 481 Mich 419, 425; 751 NW2d 8 (2008).

In reviewing a trial court's decision [*15] to grant summary disposition on the basis of statute of limitations under MCR 2.116(C)(7), we consider the pleadings and any other documentary evidence in the light most favorable to the nonmoving party. *Zwiers v Growney,* 286 Mich App 38, 42; 778 NW2d 81 (2009). If there is a factual dispute, summary disposition is not appropriate. *Id.* If there is no factual dispute, whether a claim is barred by the statute of limitations is a question of law for the court. *Id.*

We review constitutional issues de novo. *Shepherd Montessori Ctr Milan v Ann Arbor Charter Twp,* 486 Mich 311, 317; 783 NW2d 695 (2010).

We review a trial court's decision on a motion to reinstate an action for an abuse of discretion. *Wickings v Arctic Enterprises, Inc,* 244 Mich App 125, 138; 624 NW2d 197 (2000).

## B. REGULATORY TAKING

Orco argues that the trial court erred in granting defendants summary disposition on its regulatory taking claim. We disagree.

Both the United States and Michigan Constitutions prohibit the taking of private property for public use without just compensation. See US Const, Am V; Const 1963, art 10, § 2. "[G]overnmental regulations that overburden a property may also constitute a compensable taking." *Chelsea Inv Group LLC v Chelsea,* 288 Mich App 239, 261; 792 NW2d 781 (2010). [*16] To determine if a compensable regulatory taking has occurred, three factors are considered: "(1) the character of the government's action, (2) the economic effect of the regulation on the property, and (3) the extent by which

the regulation has interfered with distinct, investment-backed expectations." *Id.*, quoting *Penn Central Transp Co v New York City*, 438 U.S. 104, 124; 98 S Ct 2646; 57 L Ed 2d 631 (1978). For the first factor, the question is whether the government's action singles out the property owner or is actually a "comprehensive, broadly based regulatory scheme that burdens and benefits all citizens equally." *Chelsea*, 288 Mich App at 262, quoting *Cummins v Robinson Twp*, 283 Mich App 677, 720; 770 NW2d 421 (2009). To determine the economic effect of the regulation on the property, it is necessary to compare the value of the property that was removed by the government regulation with the value of the property that remains. *Chelsea*, 288 Mich App at 262. By itself, a "mere reduction in the value of regulated property" is not enough to demonstrate a compensable taking. *Id.*

The first factor to consider in a regulatory taking claim, the character of the government action, weighs [*17] in favor of Orco. The evidence shows that the city adopted the Overlay District in an attempt to prevent Orco from developing the property in question. Based on the zoning ordinances in place when Orco submitted its preliminary site plan, Orco was entitled to approval. However, many residents living near the property, including the mayor of Romulus, complained about the development. The city council then passed a moratorium on building permits and ultimately adopted the Overlay District, which reduced the number of lots that Orco could develop on the property. It appears that these actions were aimed solely at Orco and its plans to develop the property. In fact, in the previous litigation, the trial court ordered the city to approve Orco's preliminary site plan after determining that the city acted in bad faith and with unreasonable delay by attempting "to block this preliminary plan with every possible obstacle." The court concluded that the city singled Orco out and adopted the Overlay District "for the sole purpose of stopping Plaintiff's development and manufacturing a defense to this suit."

However, neither the second factor (the economic effect of the government regulation on [*18] the property) nor the third factor (interference with Orco's distinct investment-backed expectations) weigh in Orco's favor. Orco had not yet purchased the property when the Overlay District was adopted. The United States Supreme Court has concluded that the purchase of property with knowledge that it is burdened by a regulation does not automatically defeat a regulatory taking. See *Palazzolo v Rhode Island*, 533 U.S. 606, 626-627; 121 S Ct 2448; 150 L Ed 2d 592 (2001). The Court in *Palazzolo* stated that the takings clause, "in certain circumstances allows a landowner to assert that a particular exercise of the State's regulatory power is so unreasonable or onerous as to compel compensation." *Id.* at 627. However, in *K & K Constr, Inc v Dep't of Environmental Quality*, 267

Mich App 523; 705 NW2d 365 (2005), this Court also acknowledged that notice of such regulations should nevertheless be taken into account. As we explained, a purchaser's notice of the regulation helps shape the analysis of whether the purchaser's investment-backed expectations were reasonable. *Id* at 557. We examined the three *Penn Central* factors and stated:

> if the land-use regulation, like traditional zoning and wetland [*19] regulations: (1) is comprehensive and universal so that the private property owner is relatively equally benefited and burdened by the challenged regulation as other similarly situated property owners, and (2) if the owner purchased with knowledge of the regulatory scheme so that it is fair to conclude that the cost to the owner factored in the effect of the regulations on the return on investment, and (3) if, despite the regulation, the owner can make valuable use of his or her land, then compensation is not required under *Penn Central*. [*Id.* at 529.]

Orco knew of the Overlay District at the time it closed on the property. Thus, as the trial court pointed out, Orco had the ability to renegotiate the purchase price to take into account the Overlay District. In addition, Orco presented no evidence that the city's adoption of the Overlay District (which was in effect for all of six months) significantly decreased the property's value. Quite simply, Orco could not have developed the property while the Overlay District was in effect because it had yet to negotiate an easement for the storm water and had yet to perform soil testing.

We are not persuaded by Orco's claims that the city officials [*20] thwarted development efforts by making it impossible for Orco to obtain an easement for storm water drainage and in failing to notify Orco that it had relinquished jurisdiction of soil erosion control to Wayne County. Orco negotiated with the school district for nearly two years to obtain an easement on the district's property for the development's storm water drainage. No agreement came from these negotiations, and Orco then had to receive approval from the city to use the Superior Road ditch. Orco came forward with no admissible evidence to support its contention that the city interfered with negotiations. Additionally, there was no dispute that Orco had not applied for an SESC permit at the time the ordinance was rescinded. It does not appear that transfer of the permitting process to Wayne County was done to thwart Orco's development efforts; rather, the city relinquished control for economic reasons and the inability to support such a department.

In any event, requiring Orco to obtain the necessary permits could not itself constitute a taking of property. *Cummins v*

*Robinson Twp*, 283 Mich App 677, 719; 770 NW2d 421 (2009). The storm drainage and SESC permit requirements were consistent [*21] with *Cummins* and were merely a normal administrative step of property development.

Orco claims that the city caused it to "miss the market" and that "by the time Orco jumped through all the city's hoops, there was nobody interested in buying what Orco was selling." Orco admits that "the real estate market had so dramatically changed by mid-2005 that plaintiff could not market the property at all." It claims that it would have avoided the market downturn if defendants had not denied approval of its preliminary site plan in 2003. It is impossible to know if Orco would have actually completed its development, gotten approval of its final site plan, and sold the property before mid-2005. Orco was able to make valuable use of the property despite the regulation. It developed the property as it originally intended and placed it on the market. Because Orco purchased the property with knowledge of the regulatory scheme and because Orco made (and can make) valuable use of the property, compensation is not required under *Penn Central*.

## C. STATUTE OF LIMITATIONS

Orco argues that the trial court erred in concluding that most of its equal protection and substantive due process claims were barred by [*22] the statute of limitations. We disagree.

If no statute of limitations is specified for a particular cause of action, the statute of limitations is three years after the injury occurred, or the claim accrued. See MCL 600.5805(10). A claim accrues when "the wrong upon which the claim is based was done regardless of the time when damage results." MCL 600.5827. In addition, the Michigan Supreme Court has rejected the assertion that "a claim does not accrue until a plaintiff knows, or objectively should know, that he has a cause of action and can allege it in a proper complaint." *Trentadue v Buckler Lawn Sprinkler*, 479 Mich 378, 389; 738 NW2d 664 (2007). Nor does Michigan recognize the continuing violations doctrine. *Garg v Macomb Co Community Mental Health Servs*, 472 Mich 263, 266, 696 NW2d 646 (2005), amended by 473 Mich 1205, 699 NW2d 697 (2005).

Orco filed its complaint on July 24, 2009. Michigan law does not specify a statute of limitations for equal protection or due process claims brought under its Constitution. Therefore, the statute of limitations is three years. See MCL 600.5805(10). Consequently, any claim based on wrongs that occurred before July 24, 2006, are time-barred. Orco [*23] claims that it was not harmed, and thus no wrong occurred, until August 30, 2006, when it tried to sell the property at auction and had no bidders. We disagree. Taking the facts in a light most

favorable to Orco, it is clear that Orco argues that it sustained harm when: (1) the city allegedly persuaded the school district not to grant Orco a storm water easement; (2) the city allegedly did not inform Orco that it no longer had the authority to issue soil erosion permits; and (3) the city allegedly stalled negotiations on the long term maintenance agreement for the storm water drainage system. All of these alleged acts occurred outside of the statute of limitations. Even if Orco was not aware that the property was decreasing in value, the discovery rule does not toll the statute of limitations. See *Trentadue*, 479 Mich at 389. Moreover, it is unlikely that given the widespread news of the recession and housing crisis, Orco, a property development company, was unaware that property values were in decline. Accordingly, the trial court did not err in granting summary disposition on the basis of statute of limitations.

## D. EQUAL PROTECTION AND SUBSTANTIVE DUE PROCESS

Orco argues that the trial [*24] court erred in granting summary disposition in favor of defendants on its remaining equal protection and substantive due process claims. We disagree.

Both the United States and Michigan Constitutions provide that all people are entitled to equal protection of the laws. See US Const, Am XIV; Const 1963, art 1, § 2. "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v Olech*, 528 U.S. 562, 564; 120 S Ct 1073; 145 L Ed 2d 1060 (2000). The Michigan Supreme Court has held that Michigan's equal protection clause is coextensive with the United States Constitution's Equal Protection Clause. *Shepherd Montessori*, 486 Mich at 318. Unless legislation treats groups differently on the basis of a suspect or quasi-suspect class, or the legislation interferes with a fundamental right, the party asserting that the legislation is unconstitutional has the burden of proof. *Id.* at 319. That party must show that the legislation's classification is [*25] not rationally related to a legitimate government interest. *Id.*

The Michigan Constitution also provides that "[n]o person shall . . . be deprived of life, liberty or property, without due process of law." Const 1963, art 1, § 17. When evaluating individual governmental actions, "the governmental conduct must be so arbitrary and capricious as to shock the conscience," in order to constitute a violation of substantive due process. *Cummins*, 283 Mich App at 701. "[O]nly the most egregious official conduct can be considered arbitrary in the constitutional sense." *Id.* The Michigan Constitution's

substantive due process clause is coextensive with the United States Constitution's substantive due process clause. See *id.* The United States Supreme Court has held, "where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Sacramento Co v Lewis,* 523 U.S. 833, 842; 118 S Ct 1708; 140 L Ed 2d 103 (1998). This concept has been applied to regulatory taking claims, which fall under the Fifth Amendment. [*26] See US Const, Am V: *Cummins,* 283 Mich App at 704.

In its complaint, Orco alleged that its equal protection and substantive due process rights were violated by: (1) the acts of government officials to prevent or delay the approval of its preliminary site plan and further development, (2) the planning commission's denial of its preliminary site plan, and (3) the city council's adoption of the Overlay District. All of these acts occurred before July 24, 2006, so they are barred by the statute of limitations. In its response to defendants' first motion for summary disposition, plaintiff argues that these "continual tortious acts" occurred after July 24, 2006: (1) "July 24, 2006: the City's engineer deferred final approval pending submission of separate easement documents," (2) "August 23, 2006: the City would not agree to language in a Long Term Maintenance Agreement," and (3) "November 10, 2006: the City's engineer notes six items 'needed before formal engineering approval can be granted.'" These actions do not constitute a violation of Orco's equal protection or due process rights.

To defeat summary disposition on its equal protection claim, Orco needed to present evidence that defendants' [*27] actions were not rationally related to a legitimate government interest. See *Shepherd Montessori,* 486 Mich at 318. It has not. Our Supreme Court has recognized that zoning is "a reasonable exercise of the police power that not only protects the integrity of a community's current structure, but also plans and controls a community's future development." See *Kyser v Kasson Twp,* 486 Mich 514, 520; 786 NW2d 543 (2010). Defendants have a legitimate government interest in regulating development and requiring building permits. See *Cummins,* 283 Mich App at 701. This Court in *Cummins* explained that "[i]n disputes over municipal actions, including the issuance of building permits, only the most egregious official conduct can be considered arbitrary in the constitutional sense." *Id.* Defendants' conduct of requiring appropriate documents, including separate easement documents, was not egregious. It was within their police power to ensure compliance with applicable ordinances and statutes. Defendants' dispute with the language of the long term maintenance agreement was also not egregious; it

was reasonable for defendants to negotiate with Orco before assuming long-term maintenance responsibility [*28] for the proposed development's storm water drainage system.

Orco's substantive due process claims are based on the same governmental action that gives rise to its taking claim. The takings clause provides "an explicit textual source of constitutional protection" against the government's regulatory taking of property, so plaintiff's due process claims are more properly analyzed under the takings clause. See US Const, Am V: *Sacramento,* 523 U.S. at 842; see also *Cummins,* 283 Mich App at 704. Furthermore, to establish its substantive due process claim, plaintiff must show that defendants' conduct was "so arbitrary and capricious so as to shock the conscience." Viewing the evidence in the light most favorable to plaintiff, there is still no evidence that any conduct by defendants after July 24, 2006, was "so arbitrary and capricious so as to shock the conscience." As discussed above, defendants were within their authority to require appropriate documentation before issuing engineering approval and building permits. In addition, it was reasonable for defendants to take time to negotiate before agreeing to assume responsibility for the development's storm water drainage system. These actions [*29] were not so egregious "so as to shock the conscience." Accordingly, the trial court did not err in granting summary disposition on Orco's equal protection and substantive due process claims.

### E. PLAINTIFF'S MOTION TO REINSTATE LITIGATION

Finally, Orco argues that the trial court should have reinstated its prior case. We disagree.

MCR 2.502(C) provides that, "[o]n motion for good cause, the court may reinstate an action dismissed for lack of progress on terms the court deems just." MCR 2.502 does not prescribe a time limit for filing a motion to reinstate. However, this Court has considered how much time passed after the case was dismissed in determining if good cause exists to reinstate it. See *Wickings,* 244 Mich at 139; *Bolster v Monroe Co Bd of Rd Comm'rs,* 192 Mich App 394, 400; 482 NW2d 184 (1991). This Court has also taken into account these factors in determining whether there is good cause to reinstate: "(1) procedural or technical error in dismissing the case for lack of progress, (2) the movant's actual diligence before dismissal, (3) justification for the movant's failure to make progress before dismissal, (4) the movant's diligence in attempting to settle the case or a prompt [*30] motion to reinstate it following dismissal, and (5) potential prejudice to the nonmovant if the action is reinstated." *Wickings,* 244 Mich App at 142.

Orco moved to reinstate the previous litigation (by filing a motion to reinstate in that case, No. 04-409170) because the

issue of damages remained unresolved. The last substantive action in the previous litigation was the trial court's grant of summary disposition in favor of Orco nearly five years before. In its motion to reinstate, Orco explained that it waited so long because it was trying to mitigate its damages by selling the property. Orco's motion was denied.

Orco asks this Court to reinstate the previous litigation by reversing the trial court's order that denied its motion to reinstate. However, this order was not entered in the case associated with this appeal. Rather, it was entered in the previous litigation. Orco's request that this Court reverse that order is untimely, as it was not filed within 21 days of the order's entry. See MCR 7.204(A)(1). In its response to defendants' first order for summary disposition in this case, Orco asked the trial court to reevaluate its denial of its motion for reinstatement. The trial court [*31] refused, explaining that Orco's request was basically a motion to reconsider his previous ruling. Because Orco did not move for reconsideration within 21 days of the court's order, Orco's request was untimely.

We agree that Orco's request for reinstatement in the instant case is essentially an untimely and improper motion to reconsider the trial court's order denying Orco's original motion to reinstate. This request to reconsider was made approximately nine months after the trial court first denied Orco's motion to reinstate. In addition, Orco's original motion to reinstate was not made in this case, but rather, in the previous litigation. Hence, the trial court correctly denied the request. Even if Orco's request was timely, the trial court did not abuse its discretion in denying Orco's initial motion for reinstatement. Approximately four and a half years had passed since any action was taken in the previous litigation, and how much time has passed is a relevant consideration in determining if there is good cause to reinstate. See *Wickings*, 244 Mich at 139-142; *Bolster*, 192 Mich App at 400. In addition, the denial of Orco's motion to reinstate did not affect its opportunity to assert [*32] a claim for damages based on a regulatory taking. The previous litigation was dismissed for lack of progress, which does not constitute a final judgment. Consequently, Orco's taking claim in the instant case was not barred by res judicata.

Affirmed.

/s/ Kirsten Frank Kelly

/s/ David H. Sawyer

**Concur by:** Amy Ronayne Krause (In Part)

**Dissent by:** Amy Ronayne Krause (In Part)

## Dissent

RONAYNE KRAUSE, J. *(concurring in part and dissenting in part)*

I concur with the majority's conclusions and reasoning that plaintiff's due process and equal protection claims that are based on actions taken by the city before July 24, 2006, are barred by the statute of limitations; that the trial court properly granted summary disposition in favor of defendants on plaintiff's equal protection and substantive due process claims; and that the trial court did not abuse its discretion by denying plaintiff's motion to reinstate its prior case. However, I believe there are sufficient questions of fact as to plaintiff's regulatory taking claim that I respectfully dissent from the majority's affirmance of the trial court's dismissal of that claim. I would therefore reverse and remand as to that claim.

I agree with the majority's recitation of the applicable [*33] law and will not repeat it. Furthermore, I agree with the majority's conclusion that the "character of the government action" favors plaintiff. I appreciate that the community did not wish to have a housing development take place within its confines, and I am not unsympathetic to that; and furthermore, plaintiff here may arguably have more resources than a similarly situated individual. Nonetheless, defendants' conduct was clearly the kind of ersatz legislation specifically targeted at frustrating or harming a specific individual entity that cannot ever be countenanced.

It is a closer question whether the economic effect of the government regulation on the property weighs in either party's favor. However, if the question is a close one, on summary disposition the question should be presented to the jury. This inquiry is closely tied to the effect on plaintiff's interest-backed expectations.

The reason the question is close is that much of the harm plaintiff alleges appears to be the result of the housing market in particular, and the economy in general, both collapsing. I see no evidence that defendants are responsible for either. Furthermore, to the extent those collapses could have [*34] been predicted, plaintiff is a sophisticated party with experience in the field and therefore equally, if not better, suited to make that prognostication. While I recognize that American jurisprudence generally adopts the "eggshell plaintiff" philosophy, developers inherently assume the risk of market fluctuations when they commence long-term projects. I would hold that, no matter how egregious defendants' conduct might have been, it is unfair to hold them responsible for damages that they could not have controlled and could not have predicted.

Nevertheless, it appears that plaintiff incurred expenses and delays it should not have incurred because of defendants' calculated attempts to hinder plaintiff's project. For example, defendants allegedly did not advise plaintiff that it had relinquished jurisdiction over soil erosion and storm water drainage plans, resulting in plaintiff wasting six months and other resources submitting futile plans to defendants and subsequently adapting those plans to the new entity. While plaintiff could theoretically have renegotiated the purchase price of the property to reflect the Overlay District, I am not aware of any evidence that it was successful  [*35] in doing so; and while plaintiff did not need to purchase the property at all, the expenses and time it had already invested into the project would thereby have become entirely wasted. Furthermore, plaintiff could not have anticipated the ongoing delays and frustrations allegedly inflicted by defendants even after the purchase. Even more significantly, I believe that the Overlay District was so unreasonable that plaintiff's knowledge of it does not defeat the possibility of a regulatory taking. See *Palazzolo v Rhode Island*, 533 U.S. 606, 626-627; 121 S Ct 2448; 150 L Ed 2d 592 (2001).

I believe that, when the evidence is viewed in the light most favorable to plaintiff, there are questions of fact regarding plaintiff's regulatory taking claim. Consequently, I would reverse the trial court's grant of summary disposition as to that claim and remand for further proceedings. In all other respects, I agree with the majority.

/s/ Amy Ronayne Krause

---

End of Document

K

 Positive
As of: August 5, 2019 6:26 PM Z

# Floyd v. County of Kent

United States Court of Appeals for the Sixth Circuit

January 6, 2012, Filed

File Name: 12a0010n.06

No. 08-2015

## Reporter

454 Fed. Appx. 493 *; 2012 U.S. App. LEXIS 305 **; 2012 FED App. 0010N (6th Cir.); 2012 WL 29207

ADRON L. FLOYD, Plaintiff-Appellant, v. COUNTY OF KENT, et al., Defendants-Appellees.

**Notice:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**Prior History:** [**1] ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN.

Floyd v. Kent County, 2008 U.S. Dist. LEXIS 52324 (W.D. Mich., July 9, 2008)

## Core Terms

sentence, Unknown, appointed, attorneys, probation, rights, ineffective assistance, training, damages, trial court, district court, guidelines, guilty plea, state court, trial judge, state law, pro se, challenging, mandatory, recommend, prison

## Case Summary

### Procedural Posture

Plaintiff former inmate sued defendants, his trial attorney, a state, its governor, a county, and an unknown judicial "trainer," alleging U.S. constitutional rights violations for having been incarcerated for over 6 years on an incorrect sentence. The U.S. District Court for the Western District of Michigan sua sponte dismissed the in forma pauperis complaint under 28 U.S.C.S. §§ 1915(e)(2), 1915A(b)(1). The inmate appealed.

### Overview

Defense attorneys did not act under color of state law when performing traditional functions as counsel. Even if the unknown trainer incorrectly trained the sentencing judge, mere negligence or mistake, without proof of a culpable mental state, did not state a 42 U.S.C.S. § 1983 claim. The sentence was not directly appealed, and even if the judge had been named, he would have enjoyed absolute immunity, thus, no Fourteenth Amendment Due Process Clause claim was stated. It was not alleged that the state waived sovereign immunity, thus, the Eleventh Amendment barred any declaratory relief against it. Absent allegations that the governor was connected to or had responsibility for inadequate funding, training, qualification, and oversight of appointed defense attorneys, the alleged Sixth Amendment violations against the state and governor failed. No official county policy, custom, or practice was alleged as the moving force behind any asserted violation regarding the appointment of counsel under Mich. Comp. Laws § 775.16 (1999). While the Michigan Supreme Court vacated the erroneous sentence, it affirmed the trial court's determination on the merits that counsel had not been inadequate.

### Outcome

The district court's judgment was affirmed.

## LexisNexis® Headnotes

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > Judicial Screening

Civil Procedure > ... > Pleadings > Complaints > Requirements

for Complaint

Civil Procedure > ... > In Forma
Pauperis > Prisoners > Petitions

Civil Procedure > Parties > Pro Se Litigants > Pleading
Standards

**HN1[⬇]**  **Judicial Screening**

An appellate court reviews de novo a district court's sua
sponte dismissal of a prisoner's complaint for failure to state a
claim under 28 U.S.C.S. §§ 1915(e)(2), 1915A(b). When
deciding whether a complaint states a claim for relief, all
well-pleaded factual allegations are accepted as true. The
complaint must contain enough facts to state a claim to relief
that is plausible on its face, and a claim has facial plausibility
when the plaintiff pleads factual content that allows the court
to draw the reasonable inference that the defendant is liable
for the misconduct alleged. A complaint suggesting the mere
possibility of misconduct is insufficient. Pro se complaints are
liberally construed, however, and are held to less stringent
standards than the formal pleadings prepared by attorneys.

Civil Rights Law > ... > Section 1983
Actions > Elements > General Overview

**HN2[⬇]** 42 U.S.C.S. § 1983 creates a civil cause of action
against a defendant who, while acting under color of state
law, deprives another person of the rights, privileges or
immunities secured by the Constitution or laws of the United
States. To state a claim for relief under § 1983, a plaintiff
must allege a violation of a right secured by the United States
Constitution or laws and must show that the violation was
committed by a person acting under color of state law.

Civil Rights Law > ... > Elements > Color of State
Law > State Agents

**HN3[⬇]**  **State Agents**

Defense attorneys, whether compensated by the State or
retained by a client, do not act under color of state law for
purposes of 42 U.S.C.S. § 1983 when they perform a lawyer's
traditional functions as counsel to the accused in a criminal
proceeding.

Torts > Negligence > Types of Negligence
Actions > General Overview

Civil Rights Law > ... > Section 1983
Actions > Elements > General Overview

**HN4[⬇]** Mere negligence or mistake, without proof of the
culpable mental state applicable to the underlying
constitutional right alleged, cannot sustain a cause of action
under 42 U.S.C.S. § 1983.

Civil Rights Law > Protection of Rights > Immunity
From Liability > Judicial & Quasi-Judicial Functions

Torts > Public Entity Liability > Immunities > Judicial
Immunity

**HN5[⬇]**  **Judicial & Quasi-Judicial Functions**

A judge enjoys absolute immunity from a lawsuit seeking to
hold him liable in damages for acts committed within his
judicial jurisdiction.

Civil Procedure > ... > Federal & State
Interrelationships > State Sovereign Immunity > Federal
Judicial Limitations

Civil Procedure > ... > Federal & State
Interrelationships > State Sovereign Immunity > State
Immunity

Constitutional Law > State Sovereign
Immunity > General Overview

**HN6[⬇]**  **Federal Judicial Limitations**

Any form of relief sought against a State in federal court is
barred under the Eleventh Amendment unless the State has
waived its sovereign immunity.

Civil Rights Law > ... > Immunity From Liability > Local
Officials > Direct Causal Links

Civil Procedure > ... > Federal & State
Interrelationships > State Sovereign Immunity > State
Immunity

Civil Rights Law > Protection of Rights > Implied
Causes of Action

Constitutional Law > State Sovereign
Immunity > General Overview

Civil Rights Law > Protection of Rights > Immunity From Liability > General Overview

## HN7[↓] Direct Causal Links

A federal court may impose prospective declaratory relief to compel a State official to comply with federal law regardless of whether compliance might have an ancillary effect on the state treasury. The state official sued, however, must have, by virtue of the office, some connection with the alleged unconstitutional act or conduct of which the plaintiff complains.

Criminal Law & Procedure > Counsel > Assignment of Counsel

## HN8[↓] Assignment of Counsel

In 1999, Michigan law placed responsibility for appointing an attorney for an indigent accused on the chief judge of the circuit court in the county where the offense occurred, and not directly on the county or its executive officials. Mich. Comp. Laws § 775.16 (1999). The statute provided that appointed defense attorneys were paid from the county treasury, but only after the chief judge of the circuit court in that county certified that the appointed attorney rendered professional services and was entitled to receive reasonable compensation for the services performed.

**Counsel:** For ADRON L. FLOYD, Plaintiff - Appellant: Troy Douglas Cahill, Akin, Gump, Strauss, Hauer & Feld, Washington, DC.

ADRON L. FLOYD, Plaintiff - Appellant, Pro se, Baraga, MI.

For COUNTY OF KENT, et al., Defendant - Appellee: Daniel A. Ophoff, Corporation Counsel, County of Kent, Grand Rapids, MI.

For STATE OF MICHIGAN, Defendant - Appellee: Ann M. Sherman, Assistant Attorney General, Office of the Michigan Attorney General, Public Employment & Elections Division, Lansing, MI.

**Judges:** Before: BOGGS, SUHRHEINRICH, and STRANCH, Circuit Judges.

**Opinion by:** JANE B. STRANCH

## Opinion

[*494] **JANE B. STRANCH, Circuit Judge.** Adron Floyd was incarcerated for six and one-half years after a Michigan state judge imposed an incorrect sentence. Floyd filed a *pro se* complaint under 42 U.S.C. § 1983 alleging that his trial attorney, Timothy Haynes, Unknown Trainer(s), Kent County, Unknown Parole Board Members, Governor Jennifer Granholm, and the State of Michigan violated his federal constitutional rights. Upon initial screening, the district court *sua sponte* dismissed the *in forma pauperis* complaint under 28 U.S.C. § 1915A(b)(1), concluding that Floyd failed [**2] to state a claim against any defendant. We **AFFIRM.**

## I. FACTUAL BACKGROUND[1]

In February 1999, the State of Michigan charged Floyd in Kent County with conspiracy to deliver less than 50 grams of a mixture containing cocaine, in violation of Mich. Comp. Laws § 750.157(a) (1998), and manufacture, delivery, or possession with intent to manufacture or deliver less than 50 grams of a mixture containing cocaine, in violation of Mich. Comp. Laws § 333.7401 (2)(a)(iv) (1998). As to the latter count, the felony information provided that the penalty for conviction on that charge was a minimum of one year to a maximum of twenty years, a fine of up to $25,000, or probation for life. The information also stated that the court had authority to depart from the minimum term if the court found on the record that there were substantial and compelling reasons to depart. The information further stated that Floyd could face an enhanced [**3] sentence because he had been previously convicted of a felony drug offense. The Kent County Circuit Court appointed attorney Timothy Haynes to represent Floyd on the charges.

[*495] Floyd alleged that Haynes forced him to waive his preliminary examination and instructed him to plead guilty to the charge of possession with intent to deliver cocaine without conducting any investigation into the case or discussing any potential defenses with Floyd. He also alleged that, after pleading guilty to the charge, he informed Haynes that he wanted to withdraw his guilty plea, but Haynes pressured him not to withdraw the plea.

The sentencing hearing occurred in April 1999. Floyd alleged that Haynes was unprepared for sentencing, Haynes did not mention the correct sentencing guidelines, and Haynes guessed about what the appropriate sentence would be.

---

[1] We glean the facts from the *pro se* complaint and its attachments. We may consider exhibits attached to the complaint so long as they are referred to in the complaint and are central to the claims. *See Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680-81 (6th Cir. 2011).

However, the sentencing transcript, which is attached to the complaint, contradicts Floyd's allegations.

According to the transcript, Haynes confirmed that he had read the presentence investigation report and provided a copy of it to Floyd. Haynes acknowledged that Floyd's sentencing guidelines range was 0 to 11 months and that Floyd also faced a statutory mandatory [**4] minimum sentence of 1 to 20 years. *See* Mich. Comp. Laws § 333.7401(2)(a)(iv) (1999). But Haynes argued that the judge still possessed authority to impose a sentence of probation. His argument was supported by section § 333.7401 (2)(a)(iv), which provided that an offender "shall be imprisoned for not less than 1 year nor more than 20 years, and may be fined not more than $25,000.00, or placed on probation for life[,]" and by Mich. Comp. Laws § 769.34(4)(b) (1999), which provided (emphasis added): "If the offense is a violation of [§ 333.]7401 (2)(a)(iv) . . . and the upper limit of the recommended minimum sentence range is 18 months or less, the court *shall impose a sentence of life probation absent a departure.*" Haynes specifically asked the court not to depart from the guidelines because any departure would obviate the mandatory sentence of probation called for in § 769.34(4)(b). Instead, he asked the court to impose an intermediate sanction of probation with tether restrictions.

The sentencing judge ignored Haynes's argument that the sentencing statutes mandated a sentence of probation. The judge imposed the statutory mandatory minimum sentence of 1 to 20 years in prison with a recommendation [**5] for drug treatment, explaining that he had been taught in training that statutory mandatory minimum terms trumped the sentencing guidelines if the two were in conflict. Due to Floyd's prior drug conviction and his guilty plea to conduct that was "something more than the typical user-dealer activity on the street," the court determined the statutory mandatory prison sentence was appropriate and proportional. Floyd did not appeal.

Over two and one-half years later, Floyd filed a *pro se* motion for relief from judgment. The trial court denied the motion, expressly finding that Floyd failed to show his trial counsel's performance fell below an objective standard of reasonableness, that Floyd could not challenge the sufficiency of the evidence because he pled guilty to the charge, and that the reasons for the sentence were adequately set forth on the record of the sentencing hearing. The Michigan Court of Appeals denied Floyd's application for leave to appeal.

In 2005 the Michigan Supreme Court considered Floyd's further application for leave to appeal. The court vacated Floyd's sentence, remanded the case, and instructed the trial court to either impose a sentence of life probation or articulate

[**6] on the record a substantial and compelling reason to depart from the sentencing guidelines range, as required by *People v. Babcock, 469 Mich. 247, 666 N.W.2d 231 (Mich. [*496] 2003)*, a case decided after the trial court sentenced Floyd. In all other respects the court denied Floyd's application for leave to appeal and also explicitly denied Floyd's motion for peremptory reversal. These rulings left intact the trial court's determination that Floyd failed to establish ineffective assistance of trial counsel with regard to the conviction and the sentence.

On remand, the trial court sentenced Floyd to life probation and 12 months' time served. Floyd was discharged from prison on August 31, 2005, after serving more than six years.

Floyd then filed the instant § 1983 complaint alleging violation of his Sixth, Eighth, and Fourteenth Amendment rights due to his lengthy incarceration in violation of the sentencing statutes. Floyd sought compensatory damages from Haynes and the Unknown Trainer(s) who trained the trial judge, in their individual capacity, for physical, emotional, and mental injuries Floyd sustained due to unlawful imprisonment. Floyd sought compensatory damages from Unknown Parole Board Members and [**7] Governor Granholm, in their official and individual capacities, because he brought the sentencing defect to their attention, but they did not recommend or grant a commutation or reprieve. Floyd further requested punitive damages from each of the named individual defendants, but he expressly did not seek damages from the State of Michigan.

In addition to his requests for damages, Floyd sought declaratory relief that: (1) the State of Michigan is obligated under the Sixth Amendment to the United States Constitution and Article I, § 20 of the Michigan Constitution to provide assistance of counsel to each criminal defendant who cannot afford private counsel; (2) Kent County's failure to provide adequate funding and oversight for the public defense system violated his Sixth and Fourteenth Amendment rights because adequate legal counsel is not provided to those accused of crimes who cannot afford to hire attorneys; (3) Kent County's failure to adopt training or qualification standards for appointed defense attorneys resulted in Haynes's ineffective assistance and Floyd's unlawful incarceration, in violation of the Sixth, Eighth and Fourteenth Amendments; (4) the refusal of unknown Parole [**8] Board Members to recommend, and Governor Granholm to grant, a commutation or reprieve when they were aware Floyd was unlawfully held in prison violated his Eighth and Fourteenth Amendment rights; (5) imprisonment contrary to § 769.34(4)(b) violated Floyd's Fourteenth Amendment due process rights; and (6) Haynes's ineffective assistance and the Unknown Trainer(s)' improper training of the judge violated Floyd's Sixth, Eighth, and

Fourteenth Amendment rights.

The district court referred the complaint to the magistrate judge for initial screening under 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A(b). The district court subsequently adopted a Report and Recommendation and dismissed the complaint for failure to state a claim.

## II. STANDARD OF REVIEW

HN1[↑] This Court reviews *de novo* a district court's *sua sponte* dismissal to state a claim under 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A(b). *Thomas v. Eby*, 481 F.3d 434, 437 (6th Cir. 2007). When deciding whether a complaint states a claim for relief, all well-pleaded factual allegations are accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009); *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011). [**9] The complaint must contain "enough facts to state a claim to relief that is plausible on its face[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, [*497] 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. A complaint suggesting "the mere possibility of misconduct" is insufficient. *Id.* at 1950. *Pro se* complaints are liberally construed, however, and are held to less stringent standards than the formal pleadings prepared by attorneys. *Williams*, 631 F.3d at 383.

## III. ANALYSIS

HN2[↑] Section 1983 creates a civil cause of action against a defendant who, while acting under color of state law, deprives another person of the "rights, privileges or immunities secured by the Constitution or laws of the United States." *Barker v. Goodrich*, 649 F.3d 428, 432 (6th Cir. 2011) (quoted case omitted). To state a claim for relief under § 1983, "a plaintiff must allege a violation of a right secured by the federal Constitution or laws and must show that the violation was committed by a person acting under color of state law." *Flanory v. Bonn*, 604 F.3d 249, 253 (6th Cir. 2010). [**10] We consider in sequence Floyd's claims against the named defendants. [2]

---

[2] Floyd clarified in his reply brief that he no longer challenges the district court's rulings that the State of Michigan and the Unknown Parole Board Members are immune from liability for damages and that the complaint fails to state a claim against the Governor and Unknown Parole Board Members for their failure to grant Floyd a

### A. Attorney Timothy Haynes

Floyd cannot state a claim for ineffective assistance against Haynes in this § 1983 suit. HN3[↑] Defense attorneys, whether compensated by the State or retained by a client, do not act under color of state law when they perform a lawyer's traditional functions as counsel to the accused in a criminal proceeding. *Polk Cnty. v. Dodson*, 454 U.S. 312, 325, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981).

### B. Unknown Trainer(s)

Floyd alleged in the complaint that the Unknown Trainer(s) incorrectly trained the sentencing judge by providing an interpretation of sentencing statutes and guidelines that was contrary to § 769.34(4)(b), resulting in a period of unlawful confinement for Floyd. He specifically alleged that the Unknown Trainer(s) acted negligently or through mistake.

Even assuming the Unknown [**11] Trainer(s) incorrectly trained the sentencing judge (a position undercut by the sentencing transcript)-HN4[↑] mere negligence or mistake, without proof of the culpable mental state applicable to the underlying constitutional right alleged, cannot sustain a cause of action under § 1983. *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008); *Ellis v. Washington Cnty.*, 198 F.3d 225, 227 (6th Cir. 1999). Floyd did not identify where or for whom the Unknown Trainer(s) worked, but even further assuming that the Unknown Trainer(s) were state officials acting under color of state law, a negligent act causing unintended loss of liberty to Floyd does not implicate the Due Process Clause. *See Daniels v. Williams*, 474 U.S. 327, 328, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986).

On appeal, Floyd argues that he can pursue a theory of supervisory liability, but he does not explicitly identify any "supervisors," nor did he plead in the complaint any facts against supervisory defendants. Floyd may be contending that the Unknown Trainer(s) and certain unspecified [*498] "supervisory officials" had supervisory authority over the trial judge, improperly supervised the trial judge, or created a policy or custom under which the trial [**12] judge engaged in unconstitutional action. But if these are his claims, he has not cited any cases supporting such novel theories. Without legal support, any remand to allow Floyd to plead additional facts in an amended complaint would be futile.

Floyd further insists that he stated a due-process violation

---

commutation or reprieve.

because he was deprived of liberty when the judge imposed a sentence that did not adhere to the State's own sentencing statutes and was not authorized by state law. Had Floyd promptly raised this argument on direct appeal, he may well have achieved reversal and remand for re-sentencing at that time, shortening the length of his imprisonment. The very purpose of direct review is to correct trial court errors, leading to finality of judgment. See *Lopez v. Wilson*, 426 F.3d 339, 351 (6th Cir. 2005) (en banc) (citing *Lambert v. Warden*, 81 F. App'x 1, 8 (6th Cir. 2003)). But Floyd did not appeal, and he waited more than two years after his sentencing to file a motion for relief from judgment, ultimately persuading the Michigan Supreme Court in 2005 to reverse the erroneous sentence and remand for re-sentencing.

In this § 1983 action seeking damages for the deprivation of liberty, Floyd did [**13] not name as a defendant the trial judge who made the sentencing error. Even if he had, the HN5[⬆] judge enjoys absolute immunity from a lawsuit seeking to hold him liable in damages for acts committed within his judicial jurisdiction. See *Pierson v. Ray*, 386 U.S. 547, 553-54, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967); *Doe v. Boland*, 630 F.3d 491, 498 (6th Cir. 2011). Therefore, Floyd failed to state a claim against a proper defendant under the Due Process Clause.

## C. The State of Michigan, Governor Granholm, and Kent County

We turn now to Floyd's claims against the State of Michigan, Governor Granholm, and Kent County. Floyd fails to state a claim against any of these defendants.

Floyd sought a declaration that the State of Michigan and Governor Granholm are obligated under the Sixth Amendment to the United States Constitution and Article I, § 20 of the Michigan Constitution to provide effective assistance of counsel to each criminal defendant who cannot afford private counsel. He alleges that the failure to provide adequate funding for appointed attorneys and the failure to adopt training and qualification standards for appointed attorneys results in the provision of ineffective assistance of counsel to indigent defendants and [**14] specifically resulted in Haynes's ineffective assistance to Floyd.

Floyd cannot obtain the requested declaration against the State of Michigan because HN6[⬆] any form of relief sought against a State in federal court is barred under the Eleventh Amendment unless the State has waived its sovereign immunity. See *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 58, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-101, 104 S. Ct.

900, 79 L. Ed. 2d 67 (1984); *Hamilton's Bogarts, Inc. v. Mich.*, 501 F.3d 644, 654 n.8 (6th Cir. 2007). Floyd did not allege that the State of Michigan waived its sovereign immunity to suit. Therefore, any declaratory relief against the State of Michigan is barred by the Eleventh Amendment.

HN7[⬆] A federal court may impose prospective declaratory relief to compel a State official to comply with federal law "regardless of whether compliance might have an ancillary effect on the state treasury[.]" *S & [*499] M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 & n.10 (1989), and *Ex parte Young*, 209 U.S. 123, 160-62, 28 S. Ct. 441, 52 L. Ed. 714 (1908)). For example, in *Luckey v. Harris*, 860 F.2d 1012, 1013-14 (11th Cir. 1988), the Eleventh Circuit allowed a suit to proceed [**15] against Georgia's Governor and the state judges responsible for providing assistance of counsel to indigent criminal defendants where the plaintiffs claimed that systemic deficiencies violated their constitutional rights. The state official sued, however, must have, by virtue of the office, some connection with the alleged unconstitutional act or conduct of which the plaintiff complains. See *id.* at 1015-16.

In his complaint Floyd complained of inadequate funding, training, qualification, and oversight of attorneys appointed to represent indigent defendants, but he did not allege any facts showing how Governor Granholm is connected to, or has any responsibility for, the alleged Sixth Amendment violations, nor did he name as defendants any state judges or court administrators responsible for administering the criminal-defense system. See *Iqbal*, 129 S. Ct. at 1949; *Twombly*, 550 U.S. at 570. Therefore, the district court did not err in dismissing Floyd's Sixth Amendment claims against the State of Michigan and Governor Granholm. [3]

Floyd also did not state a claim for relief against Kent County for perceived deficiencies in providing counsel to indigent defendants. At the time of Floyd's sentencing, HN8[⬆] Michigan law placed responsibility for appointing an attorney

---

[3] The parties informed us that the adequacy of Michigan's indigent-defense system is being litigated in Michigan state courts in a class-action lawsuit. *Duncan v. State*, 284 Mich. App. 246, 774 N.W.2d 89 (Mich. Ct. App. 2009). [**16] *aff'd on other grounds*, 486 Mich. 906, 780 N.W.2d 843 (Mich. 2010), *reconsideration granted and order vacated*, 486 Mich. 1071, 784 N.W.2d 51 (Mich. 2010), *order vacated on reconsideration*, 488 Mich. 957, 790 N.W.2d 695 (Mich. 2010), *reconsideration denied*, 488 Mich. 1011, 791 N.W.2d 713 (Mich. 2010). According to Floyd's appellate counsel, that case includes claims against the State of Michigan and the Michigan Governor, and the case has been remanded to the trial court for further proceedings.

for an indigent accused on the chief judge of the circuit court in the county where the offense occurred, and not directly on the county or its executive officials. Mich. Comp. Law § 775.16 (1999). The statute provided that appointed defense attorneys were paid from the county treasury, but only after the chief judge of the circuit court in that county certified that the appointed attorney rendered professional services and was entitled to receive reasonable compensation for the services performed. [4] *Id.* Floyd did not allege [**17] any facts in his complaint to show that an official policy, custom or practice of Kent County was the "moving force" behind any asserted violation of his constitutional rights by the circuit court. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254-55 (6th Cir. 2010).

[*500] Finally, there is another reason why the district court properly dismissed Floyd's complaint. In his *pro se* pleading, Floyd challenged more [**18] than the erroneous sentence. He also alleged that his trial counsel did not conduct any investigation of his criminal case, forced him to waive his preliminary examination, and forced him to plead guilty, due in large part to systemic deficiencies. These allegations implicate Floyd's conviction, not his sentence.

In *Hadley v. Werner*, 753 F.2d 514, 516 (6th Cir. 1985) (per curiam), this Court affirmed dismissal without prejudice of a § 1983 suit challenging the Michigan system for appointing and compensating defense attorneys where the plaintiff had not yet attempted to establish through habeas corpus that he actually received ineffective assistance of state trial counsel. *See also Heck v. Humphrey*, 512 U.S. 477, 486-87, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994). In *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592 (6th Cir. 2007), this Court held that *Heck* did not bar a § 1983 suit challenging the Ohio public defender system where the defendant was in custody for only a short time and was thus foreclosed from challenging the incarceration in a habeas action. In *Miranda v. Clark Cnty.*, 319 F.3d 465, 470-71 (9th Cir. 2003) (*en banc*), the Ninth Circuit allowed a § 1983 suit challenging a

policy of the county public [**19] defender's office to proceed where the plaintiff first obtained reversal of his state court conviction through habeas corpus.

Floyd stands in a worse position than the plaintiffs in *Hadley, Powers,* and *Miranda.* Floyd actually filed a motion for relief from judgment in state court collaterally attacking both his conviction and his sentence. While the Michigan Supreme Court vacated the erroneous sentence, it affirmed the trial court's determination on the merits that Floyd received the effective assistance of counsel during his criminal proceeding as required by the Sixth Amendment. The court also denied Floyd's motion for peremptory reversal. Floyd did not further challenge the Michigan Supreme Court's ruling on ineffective assistance in a habeas corpus petition filed in federal court under 28 U.S.C. § 2254. Thus, the district court properly dismissed Floyd's § 1983 complaint as it relates to Floyd's conviction because he cannot show that the conviction was obtained as a result of ineffective assistance of trial counsel.

Although the defendants assert other reasons why we should affirm the dismissal order, we need not reach those arguments here.

## IV. CONCLUSION

Floyd's complaint fails to [**20] state a § 1983 claim for relief against any named defendant. Accordingly, we **AFFIRM.**

---

End of Document

---

[4] After Floyd was sentenced in 1999, Michigan Court Rule 8.123 was adopted in 2002, effective January 1, 2004. That rule currently provides that "[e]ach trial court must adopt a local administrative order that describes the court's procedures for selecting, appointing, and compensating counsel who represent indigent parties in that court." MCR 8.123(B). The State Court Administrator must approve the local administrative order. MCR 8.123(C). The rule also contains provisions requiring trial courts to submit certain annual reports to the State Court Administrator, including reports of the total public funds paid to each attorney for appointments by the court, and the public funds paid for appointments by each judge. MCR 8.123(D) & (F).